## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LYNNE MONSE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:15-cv-01713-MHH** |
| | } | |
| **ADTRAN, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This FMLA retaliation case is before the Court on defendant ADTRAN, Inc.'s motion for summary judgment.  (Doc. 17).  ADTRAN argues that plaintiff Lynne Monse cannot prove her claim that ADTRAN terminated her employment because she took leave under the Family and Medical Leave Act (FMLA).  For the reasons stated below, the Court grants ADTRAN's motion for summary judgment.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information,

1

affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc*., 789 F.3d 1188, 1191 (11th Cir. 2015). Accordingly, the Court views the evidence in the light most favorable to Ms. Monse.

## BACKGROUND

ADTRAN is a global provider of networking and communications equipment. ADTRAN supplies equipment that enables voice, data, video, and internet communications across a variety of network infrastructures. (Doc. 19-2, p. 11).

ADTRAN hired Ms. Monse as a buyer in November 2008. (Doc. 19-8, ¶ 3.a). Ms. Monse reported directly to the manager of Indirect Procurement, Mary Stephenson. (Doc. 19-8, ¶ 3). Ms. Stephenson reported to the Director of Global Procurement. (Doc. 19-8, ¶ 3). When Ms. Monse began her employment, the director of global procurement was Grady Broadnax. (Doc. 19-8, ¶ 3.b).

- **Ms. Monse's Early Successes and Contributions to ADTRAN**

Ms. Monse's first performance review, conducted in January 2010, covers Ms. Monse's first full year of employment with ADTRAN, the 2009 calendar year. (Doc. 19-6, pp. 6–7, tpp. 20–21). This review is signed by Ms. Stephenson and Mr. Broadnax. (Doc. 19-6, p. 61). In the overview section, the reviewers state:

> Lynne has worked diligently her first year in this position getting acquainted with ADTRAN's process of reviewing and negotiating consulting, service and software agreements. As one of her first assignments, she readily accepted the challenge of working with HR on an extensive agreement for HR's new software system, ADP.

(Doc. 19-6, p. 59). The review indicates that Ms. Monse "[e]xcels in written communications skills and her piers [sic] often seek her council in this area." (Doc. 19-6, p. 59). The supervisor comments section of this review states:

> Lynne has proven in her first year to be a positive contribution to the MRO group. She is dedicated in performing her job in a timely manner, being customer oriented, and conscientious in the details of her work. I encourage Lynne to look for opportunities to expand her knowledge in all aspects of software, service, consulting and escrow agreements.

(Doc. 19-6, p. 61).

Six months after Ms. Monse received her first review, she took FMLA leave. (Doc. 19-8, ¶ 9). The leave ran from July 23, 2010 to September 10, 2010. (Doc. 19-8, ¶ 9).

Ms. Monse's second performance review is dated January 2011. Like the January 2010 review, the January 2011 review covers the 2010 calendar year, and the review is signed by Ms. Stephenson and Mr. Broadnax. (Doc. 19-6, p. 64). In the overview section, the reviewers state:

> Lynne had a significant increase in agreements this year and has done a very good job processing the contracts. She is detailed in reviewing the contract terms & conditions in order to reduce the risk to Adtran.

(Doc. 19-6, p. 62). The "areas for improvement" section states, "Projects or assignments that are delegated to Lynne will need to be worked by establishing a timeline. This will provide small goals to achieve, leading to completing the project/assignment in a reasonable time frame." (Doc. 19-6, p. 62). The review recommends that Ms. Monse participate ADTRAN's learning program by taking classes in conflict resolution, project management, and finance. (Doc. 19-6, p. 63). The supervisor comments section of the review states:

> Lynne is a conscious worker and is always receptive to new opportunities. She keeps a positive attitude under stressful circumstances. Lynne will be given more opportunities to become more involved in projects that are assigned to the MRO Group. This will allow her to hone her skills in time management, communication, and other areas that will assist in her growth as a buyer.

(Doc. 19-6, p. 64).

Ms. Monse took FMLA leave for the second time from July 11, 2011 to September 30, 2011. (Doc. 19-8, ¶ 9).

Ms. Monse's performance review from January 2012 is signed by Ms. Stephenson and Mr. Broadnax and covers the 2011 calendar year. (Doc. 19-6, p. 67). The overview section of this review states:

> Lynne has effectively developed her skills in negotiating terms & conditions as well as pricing in software agreements. She has gained the confidence of her customers and has been commended on her quick response to their request [sic]. Lynne also was one of the significant contributors in achieving MRO's goal of 10% cost savings.

(Doc. 19-6, p. 65). Under strengths, this review states:

> Lynne has continued to expand her knowledge and skills in negotiating software agreements. These can be very challenging due to the changes in technology and new terms & conditions used by software companies to protect their I.P. She was able to achieve a significant cost savings on several software procurements in 2011.

(Doc. 19-6, p. 65). The supervisor comments section of this review states:

> Lynne continues to be a conscientious worker. She has been very supportive in taking on new responsibilities when the MRO group lost a buyer position. Lynne keeps a positive attitude and remains calm when the workload has been very stressful. I am confident that Lynne will use her MRO experience and work towards achieving cost savings goals in her commodities for 2012.

(Doc. 19-6, p. 67). Ms. Monse reviewers recommended the same subject areas for educational programs as in the previous year's review. (Doc. 19-6, p. 66).

Ms. Monse's performance review from January 2013, covering the 2012 calendar year, is signed by Ms. Stephenson and Mr. Broadnax. (Doc. 19-6, p. 71). In the overview section, this review states:

Lynne has contributed to the cost savings goal of the MRO group in 2012 in areas like capital equipment and software. She also played a major part in the support of the group in Germany, which was part of the NSN acquisition. Lynne has supported her customers in spite of the heavy workload.

(Doc. 19-6, p. 68). Under accomplishments, this review states:

1. Lynne was instrumental in setting up the order process for GmbH before and after the acquisition. Lynne has worked with several new ADTRAN GmbH employees and trained them on how to submit the proper information which has helped the turn-around time for EPROC GmbH orders.

2. Due to the NSN acquisition the amount of contracts also increased, Lynne completed several key contracts pertaining to the acquisition. The international contracts require quite a bit more information and formal verifications to complete.

3. Lynne completed IT contracts and purchases related to the NSN acquisition as well as establishing contracts for our new India entity.

4. Lynne was able to get additional cost savings for many capital equipment purchases and was requested by one engineering group to get involved in the negotiations early in the process.

5. Lynne worked with Marty Hunt's group to set up 17 new suppliers for installation services in Mexico. This included working with our Mexico lawyer to establish a contract that would better protect ADTRAN in Mexico.

6. In Q1 Lynne worked diligently in negotiating two significant cost savings with savings with SumTotal ($120K) and Spirent ($201K).

7. Lynne made a significant personal accomplishment in 2012 by making cost savings + presentation for the MRO group. This presentation was in front of the Purchasing Department, the Senior VP of Operations and other invited guests. She was very creative in her presentation and did an excellent job.

(Doc. 19-6, p. 68).

Under strengths, the 2012 review states that "[o]ne of the areas that Lynne has shown her skill and knowledge is in the area of contracts. She works several IT, software and service contracts at one time and works with the contracts group as well as the requestor to obtain the best deal for ADTRAN." (Doc. 19-6, p. 68). Under areas for improvement, this review states:

> Lynne has negotiated several small and large purchases in 2012 and obtained cost savings for ADTRAN. I would like for her to track these areas more closely in 2013 so that we can see the TOTAL savings she has accomplished. This will also help the MRO group reach our goal for cost savings.

(Doc. 19-6, p. 69). The listed goals for 2013 include, "[p]ut the toolcrib items out for bid in Q1/Q2." (Doc. 19-6, p. 71). The supervisor comments section of this review states:

> The MRO group took on the responsibility of supporting the GmbH group in Europe. Lynne has been instrumental in training this group on how to submit their requisitions to allow quicker turn-around time. She has kept a very positive attitude in spite of a very heavy workload. Lynne's hard work and support of the MRO group is very much appreciated.

(Doc. 19-6, p. 71). Ms. Monse reviewers recommended that she participate in an educational program in statistics. (Doc. 19-6, p. 70).

On October 2, 2013, Ms. Monse's title changed to procurement specialist and some of her duties shifted. (Doc. 19-8, p.5, ¶ 9; *compare* Doc. 19-7, pp. 15–

17, *with* Doc. 19-7, pp. 19–20). She acquired many more management responsibilities. (Doc. 19-7, pp. 19–20).

Ms. Monse's performance review from January 2014, covering the 2013 calendar year, is signed by Ms. Stephenson and Michael Martin. (Doc. 19-6, p. 74). At the time, Michael Martin was "in a contract position at ADTRAN." (Doc. 19-7, ¶ 2.a). In the overview section, this review states:

> Lynne has made a significant contribution to the Indirect Procurement cost savings goal. She has done a good job supporting the demands of the Indirect Procurement group while we have been short staffed. Lynne has shown improvement in her position and overall performance as a buyer.

(Doc. 19-6, p. 72). Under accomplishments, this review lists, among others, that Ms. Monse "[a]chieved a cost savings of approx. $475K for the year; which included several individual cost savings ranging from $70 up to $100K"; "[n]egotiated with a very difficult supplier . . . to waive a transfer of a software license of $17K"; and "received several positive comments this year on a job well done," including a comment that Ms. Monse helped achieve "pricing lower than we have ever seen before." (Doc. 19-6, p. 72). Under strengths, this review states that "Lynne has improved her negotiating skills to the level of being a significant contributor to the MRO cost savings goal. She has gained the confidence of vice-presidents, managers, and departments in her ability to obtain additional cost savings." (Doc. 19-6, p. 72). Further, the follow-up from Ms. Monse's last review

8

states that "[i]n the last review Lynne's area of improvement was to improve in tracking her cost savings. She has achieved this goal and also improved in the area of total cost savings." (Doc. 19-6, p. 72).

The only area for improvement stated in the 2013 review is "[c]ontinue to look for cost savings opportunities and process improvements in her commodities." (Doc. 19-6, p. 72). The goals listed for 2014 are to "[c]omplete RFP and award of tool crib contract," "[c]omplete MSA with Spirent with a negotiated discount for all purchases," "[c]omplete MSA with Shenick with a negotiated discount for all purchases," and "[c]ontinue to support the Indirect Procurement Group in achieving cost saving goals." (Doc. 19-6, p. 74). Again, Ms. Monse reviewers recommended that she participate in an educational program in statistics. (Doc. 19-6, p. 73). The supervisor comments state that "Lynne has shown improvement in her overall performance. She is a valuable part of the Indirect Procurement Group. I encourage Lynne to continue to grow in her new job title as a Procurement Specialist." (Doc. 19-6, p. 74).

- **Mr. Martin Replaces Mr. Broadnax as Ms. Monse's Supervisor**

Mr. Martin replaced Mr. Broadnax as Director of Global Procurement in February 2014. (Doc. 19-7, ¶ 2.a; Doc. 19-8, ¶ 3.b). When Mr. Martin became Director of Global Procurement, he "immediately increased the expectations of the department" because he "did not feel the team was performing at a high level."

(Doc. 19-7, ¶ 3; *see also* Doc. 19-6, pp. 3–4, tpp. 8–9).  Mr. Martin revisited some policies.  For example, Mr. Martin asked to sign all insertion orders.  (Doc. 19-1, pp. 18–19, tpp. 67–69).  An insertion order is submitted to marketing and is required to hold a company's place in advertising.  (Doc. 19-1, p. 18, tp. 68).

Shortly after Mr. Martin arrived, Ms. Monse took FMLA leave.  This was her third leave; it lasted from April 17, 2014 to May 8, 2014.  (Doc. 19-8, ¶ 9).  According to Ms. Monse, when she returned from this leave, Ms. Stephenson's demeanor towards her changed.  (Doc. 19-1, p. 9, tp. 31).  Ms. Monse stated:

> [Ms. Stephenson] did not like us to be sick.  She didn't like us to be out.  And so when I got back, there was a type of agitation that I couldn't do certain things.  She was especially getting on to me about things that had never happened before. . . . I've always done my job well and always got compliments for it, had really good reviews, but all of a sudden, it seemed that . . . she was getting on me a lot more about different things."

(Doc. 19-1, p. 9, tp. 31).

Ms. Monse did not like some of Mr. Martin's new policies.  For example, she was frustrated that Mr. Martin wanted to sign every insertion order because Mr. Martin was very busy and sometimes did not sign orders for a day or two.  (Doc. 19-1, pp. 18–19, tpp. 68–69).  Shortly after she returned from leave, Ms. Monse explained to the marketing department that the insertion orders were taking longer than usual because of the new signature procedure.  (Doc. 19-1, p. 19, tp. 69).  Ms. Monse felt that "an insertion order wasn't really a contract," so she

suggested that insertion orders might not need to be signed by Mr. Martin. (Doc. 19-1, p. 18, tpp. 67–68). Will Hewlitt, a contract lawyer for ADTRAN, told Ms. Monse that the procedure would not be changed and that Ms. Monse needed to "get used to it" and "do the best [she could]." (Doc. 19-1, p. 19, tp. 69; Doc. 19-1, p. 19, tp. 71).

The day after Ms. Monse spoke to Mr. Hewlitt, Mr. Martin opened a meeting by asking who had trashed his new procedures to the marketing department. (Doc. 19-1, p. 11, tpp. 39–40; Doc. 19-1, p. 19, tp. 69). Ms. Monse told Mr. Martin that she had worked with marketing but that she had not trashed his new procedures. (Doc. 19-1, p. 11, tp. 40). Mr. Martin stated that he did not believe Ms. Monse. (Doc. 19-1, p. 11, tp. 40). Ms. Monse acknowledged that she had let the marketing department know that new procedures were causing work to take longer than usual and that was why work was not getting done in a timely manner. (Doc. 19-1, p. 11, tp. 40).

Ms. Stephenson was present in this meeting, but she did not speak up to defend Ms. Monse. (Doc. 19-1, p. 12, tpp. 41–42). Ms. Monse believes that Ms. Stephenson should have come to her defense because she and Ms. Stephenson worked together for many years, and Ms. Stephenson was familiar with Ms. Monse's solid work ethic. (Doc. 19-1, p. 12, tp. 43). After the meeting, Ms.

Stephenson sent Ms. Monse home for the rest of the day because Ms. Monse was upset. (Doc. 19-1, p. 12, tp. 42).

The next day, Ms. Stephenson called Ms. Monse into her office. (Doc. 19-1, p. 12, tp. 42). Ms. Stephenson told Ms. Monse that she [Ms. Monse] could not argue with Mr. Martin. (Doc. 19-1, p. 12, tp. 43). This was not the first time Ms. Stephenson had talked with Ms. Monse about being argumentative. (Doc. 19-1, p. 25, tp. 93). Ms. Monse believes that Ms. Stephenson did not stand up for her and instead reprimanded her because Ms. Stephenson did not like that Ms. Monse had taken FMLA leave during April and May of that year. (Doc. 19-1, p. 13, tp. 45–47).

Some time later, ADTRAN reassigned most of Ms. Monse's responsibilities to Tiffany Ould, a temporary worker, and Shannon Barcsansky, another ADTRAN employee. (Doc. 19-1, pp. 13–14, tpp. 48–51). ADTRAN reassigned some of Ms. Barcsansky's clerical duties to Ms. Monse. (Doc. 19-1, p. 15, tpp. 54–55). Ms. Ould became responsible for the insertion orders. (Doc. 19-1, p. 19, tp. 69). Ms. Ould suggested to Mr. Hewlitt and Mr. Martin that Mr. Martin did not need to sign the insertion orders. (Doc. 19-1, p. 19, tpp. 69–70). The procedure was changed at Ms. Ould's request. (Doc. 19-1, p. 19, tpp. 69–70).

- **Performance Issues: Cost Savings Calculations and Contract Completion.**

Late in the summer of 2014, Ms. Monse negotiated excellent pricing on a new product and, according to her calculations with Ms. Stephenson, saved ADTRAN $500,000 in the process. (Doc. 19-1, pp. 25–26, tpp. 94–97, 100). In a meeting, Mr. Martin questioned whether Ms. Monse actually had saved $500,000 and criticized her for using list price as a benchmark in her cost savings calculation. (Doc. 19-1, p. 26, tpp. 97–98). Ms. Stephenson did not defend Ms. Monse in this meeting. (Doc. 19-1, p. 26, tp. 98). Ms. Monse and Ms. Stephenson then recalculated using a different benchmark and determined that Ms. Monse had saved $150,000 for ADTRAN, not $500,000. (Doc. 19-1, p. 26, tpp. 98–99).[1]

Also late in the summer of 2014, Rich Johnson emailed Ms. Monse to ask for an update on the Sungard contract, a contract that had been under negotiation for some time. (Doc. 19-3, p. 25). On September 5, 2014, Ms. Monse responded, "I don't' think I answered this one! Sorry about that! I talked to Matthew Phayre last week and they are extending the contract to give us time to negotiate the contract. I'm not sure when the legal review will be finished, but I'll give another update next Wednesday." (Doc. 19-3, p. 25). Mr. Johnson responded, "I had a VM from Matthew last week wanting to get an update, and I was out of the office.

---

[1] Ms. Monse argues that the methodology behind her initial calculation is sound. (Doc. 22, p. 8, ¶ 14).

13

If at all possible, I need to get this one closed out soon." (Doc. 19-3, p. 25). The date on that email is not visible in the record, but Ms. Monse responded on December 15, 2014 and stated:

> This one got pushed down in priority (with okay from Matt Phayre) and is still pending with legal.
>
> End of the year is especially busy too, should we hold off contacting the new rep until January 5th?
>
> We should be able to get this pushed through before the end of January.

(Doc. 19-3, pp. 24–25). On December 16, 2014, Mr. Johnson replied:

> I would very much like to get this done as soon as possible. We were supposed to be completely finished with the migration to Assurance by the end of Q3 2014, and since the contracts are still pending we have not even begun that process.
>
> The new rep has contacted me this week looking for a status.
>
> I know things are busy and schedules are hectic, but please give me a date when it can be completed. The end of January is a long way off, and I hate to get to that point still not having made any progress.

(Doc. 19-3, p. 24). On February 3, 2015, Ms. Monse forwarded this email chain to Ms. Stephenson. (Doc. 19-3, p. 24). If Ms. Monse responded to Mr. Johnson, her response is not in the record. (Doc. 19-3, p. 24).

- **Ms. Monse's Final FMLA Leave**

On Saturday, December 13, 2014, Ms. Monse woke with pain in her leg and went to the emergency room. (Doc. 19-1, p. 20, tp. 74). The doctor who examined

Ms. Monse told her to stay home for three days. (Doc. 19-1, p. 20, tp. 74). In spite of this instruction, Ms. Monse went to work on Monday, December 15, 2014, because that day, there was a critical purchase order deadline on one of her contracts. (Doc. 19-1, p. 20, tp. 74). Ms. Monse negotiated a two-day extension to submit the purchase order. (Doc. 19-1, p. 20, tp. 75).

In her deposition, Ms. Monse stated that she asked Ms. Stephenson if she could work from home for three days. (Doc. 19-1, p. 20, tp. 75). The record contains an email exchange between Ms. Monse and Ms. Stephenson concerning the proposed accommodation. On Wednesday, December 17, 2014, Ms. Monse wrote to Ms. Stephenson, "I will not be in the office today, I have a doctors [sic] excuse to cover 3 days. I worked from home yesterday and will attempt to work from home today as much as possible. If you need me call me." (Doc. 19-4, pp. 18–19). Ms. Stephenson replied, "You will need to be caught up on your workload before you leave on vacation. Please send me what you are currently working." (Doc. 19-4, p. 18). Ms. Monse responded:

> I haven't missed any time yet that would have caused me to get behind on work.
>
> - I worked 8.5 hours on Monday without a lunch (came in to get the Spirent PO extended, but status changed and we decided to get it done).
> - I sat at the computer yesterday from home for 9 hours and worked on Spirent and the Toolcrib, worked with Tiffany on her EPROCs and several other issues.

- I called Elin at Spirent on my cell and got an extension on the PO again and sent emails expediting that for another hour.
- Rick approved the EPROC at 8:30 and Paul sent a message.
- I've emailed Tim this morning (before I sent your original email), checked on all 4 Spirent EPROCs, updated my weekly report, approved reqs and sent approval emails.

I will continue to monitor my emails and remain on top of my projects while I am out.

When I came in Monday the walking to and from the office aggravated my Sciatica.

I am still working, but in order for this Sciatica pain to subside, I will need to work from home which allows me to take my medicine and eliminates the walking aggravation.

Call me if you need me for anything.

(Doc. 9-4, p. 18).

Ms. Monse worked from home Tuesday, Wednesday, and Thursday that week. ((Doc. 19-1, p. 20, tp. 76). During that time she acquired approval from the vice-presidents of four different departments on the critical purchase order. (Doc. 19-1, p. 21, tpp. 77–78). On Wednesday, Ms. Monse sent the Spirent purchase order to Mr. Martin and Ms. Stephenson for approval. (Doc. 19-1, p. 21, tp. 78). Getting approval from purchasing was usually easy, but this time it was difficult. (Doc. 19-1, p. 21, tp. 78). Mr. Martin was angry that Ms. Monse was seeking approval at the last minute. (Doc. 19-1, p. 21, tpp. 79–80). Ms. Monse believes that Mr. Martin and Ms. Stephenson took longer than usual to approve the

purchase order because Ms. Monse had taken FMLA leave in April and May of that year. (Doc. 19-1, p. 22, tp. 82).

On Friday, December 19, 2014, Ms. Monse took a sick day and went to see her general practice doctor because her leg had not improved. (Doc. 19-1, p. 22, tpp. 83–84). Ms. Monse's doctor set up an MRI and an appointment with a specialist. (Doc. 19-1, p. 22, tp. 84). He instructed Ms. Monse to work from home until the neurologist was able to see her. (Doc. 19-1, p. 23, tp. 85). Ms. Monse provided notice of her condition to ADTRAN that day.

On Monday, December 22, 2014, Ms. Monse spoke with Ms. Stephenson. (Doc. 19-1, p. 23, tp. 85). Ms. Stephenson told Ms. Monse to stop working and to apply for FMLA leave because Ms. Monse would not be allowed to work from home. (Doc. 19-1, p. 23, tp. 86). Ms. Monse took FMLA leave from January 5, 2015 to February 13, 2015. (Doc. 19-8, ¶ 9). The days between December 22, 2014 and January 5, 2015 were counted as holidays, weekends, sick days, or vacation days. (Doc. 19-1, p. 23, tp. 87).

On February 9, 2015, Ms. Stephenson wrote an email about Ms. Monse to Diane Matthews in ADTRAN's human resources department. (Doc. 19-6, p. 22, tp. 83). The email reads:

> In respect to our discussions concerning Lynne, I went into her office in order to find the paperwork on things that she was working before she left. I found several contracts that were signed by ADTRAN but didn't have the supplier's signature. Some dated back

to 2013, but there were several from 2014. This is something that I
have verbally told her before that she needed to stay on top of getting
a fully executed copy for our files.

(Doc. 19-6, p. 96).

- **Ms. Monse's 2015 Performance Review and PIP**

Ms. Monse's performance review dated January 2015, covering the 2014
calendar year, is signed by Ms. Stephenson and Mr. Martin. (Doc. 19-6, p. 78).
Although the signatures are dated March 23, 2015, Ms. Monse and Ms. Stephenson
discussed this review on March 19, 2015. (Doc. 19-6, p. 28, tp. 102). Under
overview, this review states, "Lynne had another good year for cost savings. She
was one of the significant contributors to the overall Indirect Procurement goal.
Lynne's overall performance does need improvement in respect to completing
projects and finalizing contracts in a timelier manner." (Doc. 19-6, p. 75). The
accomplishments listed include: "[p]rovided a total cost savings of $375,794 for
the year," "negotiated and completed 15 MSA's within a very short time frame,"
"[w]orked with Professional Services and the Purchasing Contract Manager to
update the domestic Master Subcontracting Agreement," and "[n]egotiated best
pricing and swapping of older equipment for new equipment." (Doc. 19-6, p. 75).
Under strengths, the review states that "Lynne is strong in her negotiation skills
and continues to make a significant contribution to the Indirect Procurement cost
savings goal. When Engineering has large purchases they will call Lynne to assist

in negotiating the best pricing for ADTRAN (i.e. Shenick, Spirent, etc.)." (Doc. 19-6, p. 75).

The areas for improvement section of the 2014 review states:

> Lynne needs to make improvements in respect to her completing projects on time, processing time of contracts and communicating with management. Lynne needs to be able to state her point concisely and without being argumentative. Lynne had a RFQ for the toolcrib that was to be sent out by the end of March. It was sent out June of 2014 and as of the date of this review has not been completed. Lynne needs to be more organized and develop a process on following through with the contracts and purchases she is handling. An example would be concerning contracts that have been signed by ADTRAN but not obtaining a final copy from the supplier to put in our files.

(Doc. 19-6, p. 75). Under goals for 2015, the review lists:

> –Complete toolcrib bid by March 31, 2015
> –Focus on improving in the areas stated in this review.
> –Any contracts that have not been completed in 2014 will need to be finalized by March 31, 2015.
> –Continue to contribute to the cost savings goal for Indirect Procurement
> –Complete contracts within 1-2 months from receipt of requestor and/or requisition. This is to include a final copy signed by both parties.

(Doc. 19-6, p. 78). The supervisor comments state that "Lynne has strong negotiation skills; she does however need to make improvements in her role as Procurement Specialist. She needs to increase her overall turnaround time in her workload as well as improving her communication skills when dealing with management." (Doc. 19-6, p. 78). The reviewers recommended that Ms. Monse

participate ADTRAN's learning program by taking classes in conflict resolution, time management, and goal setting. (Doc. 19-6, p. 77).

In the space for employee comments in the 2014 review, Ms. Monse wrote: "I respectfully request an extension to April 15th on the toolcrib bid. This will allow me to complete EOQ contracts due on 3/31/15 and will give the supplier and approvers sufficient time to respond." (Doc. 19-6, p. 78). She also attached a four-page typed response titled "Comments to Employee Performance Appraisal 2014 – given on 3/19/15." (Doc. 19-6, pp. 79–82). This response includes explanations for deadlines that had not been met and Ms. Monse's assessment of future deadlines that she did not believe were realistic. (Doc. 19-6, pp. 79–82).

A performance improvement plan or PIP accompanied Ms. Monse's 2014 evaluation. (Doc. 19-5, p. 19, tp. 59). According to Mr. Martin, "[t]he decision was made to put [Ms. Monse] on a performance improvement plan when [ADTRAN] completed [its] evaluation of [its] employees based on their performance in calendar year [2014], which was completed in November of 2014." (Doc. 19-5, p. 19, tp. 59). Ms. Stephenson stated in her deposition that she began preparing Ms. Monse's January 2015 evaluation and the attached performance improvement plan (PIP) in December 2014 and completed both in January 2015. (Doc. 19-6, pp. 10–11, tpp. 36–37). Ms. Monse was not told about the evaluation

or the PIP until March of 2015, weeks after she returned from FMLA leave on February 14, 2015. (*See* Doc. 19-6, pp. 10–11, tpp. 36–37).

Ms. Monse's PIP stated:

The purpose of this Performance Improvement Plan (PIP) is [to] outline performance deficiencies and action items that need to be completed to satisfy job performance to continue Lynne Monse's employment as a Procurement Specialist.

The PIP below will outline performance deficiencies and action items to be completed to satisfy the requirements of Lynne's job. The PIP below will begin immediately and [be] monitored by Mary Stephenson. The metrics in this plan will require communication with Lynne and I. We will review her performance to the PIP each week. Failure to meet this plan can result in further disciplinary action up to and including termination.

**A.** **Performance Deficiency:**

Beginning in early 2014 Lynne has not been contributing to the team at an acceptable level. In spite of discussions with Lynne that performance expectations for Procurement have been raised to a higher level, she continues to perform her job tasks at a pace that is unacceptable to both management and her customers.

Her projects are not completed in a timely manner. Contracts that she has completed negotiating did not have both parties [sic] signature. Request by an Internal customer to negotiate a contract was sent to her in August but as of December was not completed.

When Lynne is informed of her deficiencies, she becomes defensive and argumentative.

**Examples of Deficiency–**

- Lynne was to send out a Request for Quotation for the toolcrib by the end of March 2014. It was not sent out until June and has yet to be completed.

- Contracts (i.e. AT&T, Spiceworks, Broadsoft Sales Quotation, New Bay Marketing Services) signed by ADTRAN in early 2014 did not have the supplier's signature.

- Lynne received a request in August 2014 to review a contract with Sungard. Several emails were exchanged with the requestor that she was working on the contract, but as of December 2014 had yet to be completed.

- In a meeting which management brought up a situation about the new contract process being presented to a requestor in a negative manner, Lynne stated she talked to a requestor about the process but not in a negative manner. When the manager responded, she continued to argue her point.

**Improvement Plan –**

- The proposals received for the toolcrib are to be reviewed, finalized and the contract awarded by March 31, 2015. Going forward any other projects that Lynne is working will be tracked in a spreadsheet and reported on a weekly basis. When Lynne is given a project she is to report within 2 business days a project plan with milestone dates. The spreadsheet is to show receipt date of project, milestones, and comments on progress.

- All contracts and tasks will be reported on the weekly spreadsheet and will be given completion dates. Lynne is to show weekly progress towards completion of the contract and/or tasks.

- Contracts which have been completed are to be signed by both parties within 7-10 days of completion.  This is also to be reflected on the weekly spreadsheet status report.

- Lynne is to take a Conflict Management class within the next 60 days to help her in conversations where there is conflict and avoid becoming argumentative.

The steps outlined are needed for Lynne to be a successful Procurement Specialist.  As stated I will monitor performance.  Each step must be completed as outlined.  Lynne and I will meet weekly to review her progress.  Any exceptions must be approved by me.  Failure to successfully meet the improvements stated above could result in further disciplinary action up to termination.

(Doc. 19-4, pp. 39–40).

The PIP is signed by Ms. Monse, Ms. Stephenson, and Kelly Ellis.  (Doc. 19-4, p. 40).  According to Mr. Martin, typically, when an employee is placed on a PIP, the employee is expected to show improvement within thirty to ninety days.  (Doc. 19-5, p. 21, tp. 80).

Ms. Monse asserts that she completed all the assignments on her PIP.  (Doc. 19-1, pp. 57–58, tpp. 224–225).[2]  Nevertheless, on May 18, 2015, as part of a firm-wide reduction in force, ADTRAN terminated Ms. Monse and two other employees, Henry L. Paul Jr., a buyer, and Jason W. Salter, a Global Commodity Manager.  (Doc. 19-7, pp. 10–12, ¶ 11).

---

[2]  Ms. Stephenson contends that Ms. Monse did not adequately complete all the assignments on her PIP.  (Doc. 19-6, pp. 29–38, tpp. 109–43, 146–47).  For purposes of this motion, the Court views the facts in the light most favorable to Ms. Monse and assumes that she did complete the assignments to ADTRAN's specifications.

Ms. Monse filed an EEOC charge of discrimination against ADTRAN on July 20, 2015. (Doc. 19-1, pp. 73–74). She filed this action on September 29, 2015. (Doc. 1). Ms. Monse alleges that ADTRAN terminated her employment because she took FMLA leave. (Doc. 1, ¶¶ 27–40).[3] The claim does not appear to relate to the first two times Md. Monse took FMLA leave. Rather, the claim pertains to the periods of FMLA leave that she took in the spring of 2014 and the beginning of 2015. ADTRAN contends that it is entitled to judgment in its favor on Ms. Monse's claim because Ms. Monse cannot show that ADTRAN terminated her because she took FMLA leave. (Doc. 18, pp. 18–22).

## ANALYSIS

"The FMLA grants eligible employees a series of entitlements, among them the right to 'a total of 12 workweeks of leave during any 12–month period' for a number of reasons, including 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017)

---

[3] Initially, Ms. Monse also asserted that ADTRAN terminated her because of her age. (Doc. 1, ¶¶ 19–26). She voluntarily dismissed this claim. (Doc. 36). ADTRAN argues that Ms. Monse cannot prove either her claim of age discrimination or her claim of FMLA retaliation because she asserted both theories of liability and therefore cannot prove that either age or FMLA use was the only reason for her termination. (Doc. 18, pp. 16–18). The Court rejects this argument because "Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of alternative and inconsistent claims." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009); *see also Savage v. Secure First Credit Union*, No. 15-12704, 2016 WL 2997171, at *1 (11th Cir. May 25, 2016) (reversing the district court for finding that a plaintiff cannot alternatively plead claims for retaliation and discrimination).

(quoting 29 U.S.C. § 2612(a)(1)(D)).  "To preserve and enforce these rights," the FMLA authorizes employees to assert retaliation claims against employers who penalize them for taking leave.  *Jones*, 854 F.3d at 1267 (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) and citing 29 U.S.C. § 2615(a)–(b); 29 C.F.R. § 825.220(c)).

To succeed on her retaliation claim, Ms. Monse must prove that ADTRAN "intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right."  *Jones*, 854 F.3d at 1267 (quoting *Strickland*, 239 F.3d at 1207).  "In other words, [Ms. Monse] must show that [ADTRAN's] actions were motivated by an impermissible retaliatory or discriminatory animus."  *Jones*, 854 F.3d at 1270 (internal quotation marks omitted) (quoting *Strickland*, 239 F.3d at 1207).

Ms. Monse has not presented direct evidence that ADTRAN terminated her employment because of her FMLA leave.  (Doc. 19-1, p. 8, tp. 28).  She also does not present evidence of comparators who were treated more favorably than her.  (Doc. 22, p. 29).  Instead she relies on circumstantial evidence of ADTRAN's intent.  Therefore, to evaluate Ms. Monse's claim, the Court "must employ the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792[] (1973), to analyze [Ms. Monse's]

retaliation claim." *Jones*, 854 F.3d at 1270 (citing *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010)).

Under the *McDonnell Douglas* framework, Ms. Monse initially must establish a prima facie case of discrimination or retaliation. She must demonstrate that she "engaged in statutorily protected activity," she "suffered an adverse employment decision," and "the decision was causally related to the protected activity." *Jones*, 854 F.3d at 1270 (quoting *Schaaf*, 602 F.3d at 1243). If Ms. Monse can establish a prima facie case of discrimination, then ADTRAN must "articulate a legitimate, nondiscriminatory reason" for terminating Ms. Monse. *Jones*, 854 F.3d at 1270 (quoting *Schaaf*, 602 F.3d at 1243). If ADTRAN can do so, then Ms. Monse "must show that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination." *Jones*, 854 F.3d at 1270 (citing *Schaaf*, 602 F.3d at 1244).

In the end, discriminatory intent is the crux of the matter. "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence." *Smith*, 644 F.3d at 1328. "[S]o long as the circumstantial evidence

raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith*, 644 F.3d at 1328.

## A.    Prima Facie Case of Discrimination

Ms. Monse has established a prima facie case of discrimination.  Ms. Monse engaged in statutorily protected activity by taking FMLA leave, and she suffered an adverse employment action when ADTRAN terminated her employment.  Thus, the only question before the Court is whether ADTRAN's decision to terminate Ms. Monse was causally related to Ms. Monse's FMLA leave.  "[T]he causation prong of the *McDonnell Douglas* prima facie test is to be interpreted broadly and is satisfied if a plaintiff shows that the protected activity and adverse action were not wholly unrelated."  *Jones*, 854 F.3d at 1273 (quoting *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010)) (internal quotation marks omitted).

"'Close temporal proximity between protected conduct and an adverse employment action is generally "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."'"  *Jones*, 854 F.3d at 1271 (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)).  "But 'temporal proximity, without more, must be "very close"'" in order to satisfy the causation requirement."  *Jones*, 854 F.3d at 1271–72 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).  "'[A] three to four month disparity' between the statutorily protected conduct and the

adverse employment action is too long to establish temporal proximity." *Jones*, 854 F.3d at 1272 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). "[T]emporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Jones*, 854 F.3d at 1272.

In this case, just over three months passed between Ms. Monse returning from her final FMLA leave and her termination; however, Ms. Monse asserts that as soon as she returned from her FMLA leave in May of 2014, her supervisors at ADTRAN began criticizing her work in ways they had not before, gave her a negative performance evaluation for the first time, and late in 2014, while she took a second period of FMLA leave, instituted a PIP to provide a justification for terminating her employment when she returned from FMLA leave. (Doc. 19-1, p. 9, tpp. 29–31; Doc. 19-1, p. 22, tpp. 82–83; Doc. 19-1, p. 30, tp. 115). Under these circumstances, Ms. Monse presents sufficient circumstantial evidence to raise an inference that ADTRAN terminated her for using FMLA leave.

## B. ADTRAN's Legitimate, Nondiscriminatory Reason

ADTRAN has articulated a legitimate, nondiscriminatory reason for terminating Ms. Monse. "[T]he employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons.

It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Jones*, 854 F.3d at 1274 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)) (internal marks omitted).    ADTRAN has identified a number of legitimate nondiscriminatory reasons for terminating Ms. Monse.

In his affidavit, Mr. Martin states that on November 24, 2014, he performed his annual ranking of employees and ranked Ms. Monse second to last.  (Doc. 19-7, ¶ 8; Doc. 31-1, p. 4).  ADTRAN submitted Mr. Martin's ranking as a sealed exhibit (Doc. 31-1, p. 4), and ADTRAN submitted metadata that indicates that Mr. Martin created the document on November 24, 2014 and last modified it on December 2, 2014 (Doc. 19-7, p. 31).  In the rankings, Mr. Martin wrote that Ms. Monse "was the '[w]eakest member of the team.  Can be disorganized and inefficient with projects she's currently working on.  Requires others to prioritize and complains rather than identifying solutions to problems.'"  (Doc. 19-7, ¶ 8.b). In his affidavit, as examples, he described the incident when Ms. Monse questioned his new signature procedures, the incident when she calculated cost savings using retail price as a benchmark, and the incident when she asked him to approve a purchase order at the last minute based on a deadline set by the supplier. (Doc. 19-7, ¶ 9).  He also listed the toolcrib project and the Sungard contract as examples of projects that Ms. Monse did not complete in a timely manner.  (Doc.

19-7, ¶ 9.d.1.a). He stated, "Ms. Monse routinely failed to close out contracts, did not display initiative, routinely offered excuses for her failings (instead of completing the assignments) and was not accomplishing goals like her coworkers." (Doc. 19-7, ¶ 9.d).

Managers also submitted merit rankings of employees the first week of December of each year. (Doc. 19-7, ¶ 10). In her affidavit, Ms. Stephenson reports that she ranked Ms. Monse last or second to last each year from 2010 to 2014. (Doc. 19-8, ¶ 8). Ms. Stephenson's merit rankings corroborate her testimony that she ranked Ms. Monse last or second to last each year. (Doc. 48-2, pp. 1–2; Doc. 48-3, p. 1; Doc. 48-4, p. 1; Doc. 48-5, p.1; Doc. 48-6, p.1).[4]

These rankings and Mr. Martin's evaluation impacted the May 2015 RIF decisions. In the first quarter of 2015, maybe in March, Mike Foliano communicated to Mr. Martin "that ADTRAN was projecting lower than expected profitability" and ADTRAN needed to "scrutinize operating expenses," including "headcount." (Doc. 19-7, ¶ 11). "Based on Mr. Foliano's direction to assess operating expenses, [Mr. Martin] chose to scrutinize employees within [his] department, and eliminate one employee from each Department within Procurement: Indirect Procurement, Direct Procurement and Purchasing." (Doc.

---

[4] When the Court reviewed of the parties' evidence, the Court discovered references to Ms. Stephenson's annual rankings, but the Court could not locate the actual rankings in the record. Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, the Court asked the parties if Ms. Stephenson's rankings were available. ADTRAN subsequently provided the rankings to the Court and placed the rankings in the record under seal.

19-7, ¶ 11.c.1).  Using the rankings from November 2014, he identified the poorest performers on each of the three departments and terminated those employees. (Doc. 19-7, ¶ 11.d–e).  Mr. Martin identified Ms. Monse as the lowest performer in Indirect Procurement.

Mr. Martin stated in his deposition that he made the decision to terminate Ms. Monse.  (Doc. 19-5, p. 7, tp. 21).  He explained that he "solicited the opinion of Ms. Stephenson" before making the decision and that they "reached the joint conclusion that Ms. Monse was not going to be a highly effective employee on a go forward basis, based on a number of different factors over the course of several years of observation."  (Doc. 19-5, p. 7, tp. 21).  He stated that his decision was based on "both personal observation" and Ms. Stephenson's observation, "the review of [Ms. Monse's] progress in weekly updates that were provided," "oral third-party observations that [Mr. Martin] received from people [who] worked with Ms. Monse internal to ADTRAN," and "[Ms. Stephenson's] recommendations and performance review."  (Doc. 19-5, p. 7, tpp. 21–22).  Later in his deposition, Mr. Martin reiterated his reasons, stating:

> Ms. Monse was terminated based on reviews of her performance during my time at ADTRAN, on a weekly basis or as often as time permits.  Not always every single week but it's scheduled on a weekly basis.  We have a staff meeting during which we review the contributions of the team and the projects that they're working on and the status of those projects.  When we go into those conversations and that staff meeting, Mary [Stehenson]'s entire team is present during that staff meeting.  We review those objectives.  They are rolled up

into my weekly report which goes to my senior management. So through those weekly meetings and through the status updates that I have sent to me every week, I can see the progress that individual employees and . . . groups and teams are having with completing projects in a timely fashion. One of the things that I used in my determination to terminate Ms. Monse was that weekly report that I would get that highlighted what she had completed and what she hadn't completed.

(Doc. 19-5, pp. 13–14, tpp. 48–49). Mr. Martin added:

I also relied upon my own personal observations, including her argumentative nature and her desire to blame other situations for reasons that she couldn't complete projects on time and on task. I relied on third-party observations. And by third-party observations, for example, the SunGard contract and her lack of responsiveness back to the . . . IT group or the information technology group at ADTRAN in getting . . . even updates back to that where e-mails were escalated to me to ask what the status of this project was. I relied on verbal third-party observations from our services group at how long it was taking to get services contracts completed and finished in a timely fashion. And I also relied on Mary [Stephenson]'s input, both through the performance evaluation process, as well as through her merit rankings. So those are the four reasons. The culmination of all those items is . . . what I used to base my decision to terminate.

(Doc. 19-5, p. 18, tpp. 67–68). Thus, ADTRAN has articulated legitimate nondiscriminatory reasons for terminating Ms. Monse.

## C.  Evidence of Pretext

Ms. Monse has not offered sufficient evidence to establish that ADTRAN's articulated reasons are a pretext for retaliatory conduct. To show pretext, Ms. Monse must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable

factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Jones*, 854 F.3d at 1274 (quoting *Chapman*, 229 F.3d at 1024). Ms. Monse cannot show that ADTRAN's stated reasons for terminating her were pretextual "simply by 'quarreling with the wisdom' of those reasons." *Jones*, 854 F.3d at 1274 (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). Instead, to establish pretext, Ms. Monse must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in ADTRAN's proffered legitimate reasons for its action "that a reasonable factfinder could find them unworthy of credence." *Jones*, 854 F.3d at 1274 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

To avoid summary judgment, Ms. Monse must rebut ADTRAN's proffered reasons and produce sufficient evidence to discriminatory intent. *Chapman*, 229 F.3d at 1037. When analyzing whether an employer's proffered reasons are a pretext for discrimination, a court "must be careful not to allow [] plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). Courts "'are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged

employment decision.'" *Rojas*, 285 F.3d at 1342 (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)).

Ms. Monse argues that Mr. Martin's stated reasons for terminating her are inconsistent. (Doc. 22, pp. 20–25). An employer's inconsistent explanations for termination may support a finding that those explanations are a pretext for discrimination. *See Jones*, 854 F.3d at 1275 ("[A] jury could reasonably conclude that Daniel's explanations are inconsistent, contradictory, and implausible."); *Hurlbert*, 439 F.3d at 1298 ("[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext.").

But Mr. Martin's stated reasons are not inconsistent. Mr. Martin has provided multiple reasons for terminating Ms. Monse, but the reasons do not contradict one another, and the reasons are plausible. Although Mr. Martin was the Director of Global Procurement for a little less than a year before he began evaluating employees for layoff, over those months, Mr. Martin repeatedly criticized Ms. Monse's work because he felt that she was argumentative, she failed to meet deadlines, and she blamed others for her delays. He repeatedly stated that he reached this conclusion through his personal observation and through the input of Ms. Stephenson and other ADTRAN employees who worked with Ms. Monse. Merit rankings for the employees in the Global Procurement Department

demonstrate that Ms. Monse consistently ranked last or second-to-last in her ranking group. (Doc. 48-2, pp. 1–2; Doc. 48-3, p. 1; Doc. 48-4, p. 1; Doc. 48-5, p.1; Doc. 48-6, p.1). The rankings also demonstrate that the other two employees who lost their jobs in the layoff either ranked last or near last in their respective groups. *Id.* The employee who was ranked near last in Mr. Martin's November 2014 listing was part of the layoff because that employee had dropped to last in between the time the rankings were produced and the time Mr. Martin received instructions to implement a reduction in force. (Doc. 19-7, ¶ 11(d)(1)).

To establish inconsistency, Ms. Monse contrasts testimony in which Mr. Martin stated that he did not talk to Ms. Monse directly to testimony in which Mr. Martin stated that he used his conversations with Ms. Monse as a basis for terminating her. (Doc. 22, p. 22). This argument mischaracterizes Mr. Martin's deposition testimony. Mr. Martin stated that he did not talk to Ms. Monse directly about her prioritization of different projects. (Doc. 19-5, p. 14, tp. 50). He did not state that he never talked to Ms. Monse; rather, he testified that, because Ms. Monse did not report directly to him, he had face-to-face contact with her less than fifteen percent of the work hours in a week. (Doc. 19-5, pp. 18–19, tpp. 69–69). He also described meeting with her team approximately once per week. (Doc. 19-5, pp. 13–14, tpp. 48–49).

Ms. Monse also argues that Mr. Martin's stated reasons for termination conflict with what Ms. Matthews told her when she (Ms. Monse) was terminated. When Ms. Monse expressed disbelief that she was being terminated even though she had completed all the tasks on her PIP, Ms. Matthews told her that "it had nothing do with [the PIP] that it was a business decision that ADTRAN made to let [Ms. Monse] go." (Doc. 19-1, pp. 57–58, tpp. 224–25). This statement is consistent with Mr. Martin's explanation that he chose to eliminate three employees because in the first quarter of 2015, ADTRAN had to "scrutinize operating expenses," including "headcount." (Doc. 19-7, ¶ 11). The fact that Ms. Monse had completed all of the tasks on her PIP does not mean that she was not still the lowest performing employee in the indirect procurement group. Mr. Martin stated that he believed that Ms. Monse did not have "the potential to be even middle level performance over the long term." (Doc. 31-2, p. 2, tp. 16).

Ms. Monse argues that the abrupt change in her performance reviews is evidence of pretext. (Doc. 22, pp. 24–27). When "employees with good employment histories suddenly begin receiving poor evaluations when a new supervisor c[omes] on," this may be circumstantial evidence of discrimination, but "the factual basis of the poor evaluation [must be] in dispute," or the plaintiff must show that she has been "singled out" for "increased enforcement of departmental regulations." *Rojas*, 285 F.3d at 1343. Ms. Monse's evaluations were positive

prior to January 2015, but Ms. Monse does not dispute that the incidents in 2014 for which she was criticized took place, including the incident when Ms. Monse questioned Mr. Martin's new signature procedure, the incident when she calculated cost savings using retail price as a benchmark, and the incident when she asked Mr. Martin to approve a purchase order at the last minute based on a deadline set by a supplier. (Doc. 19-1, pp. 11–12, tpp. 39–43; Doc. 19-1, pp. 18–19, tpp., 67–69, 71; Doc. 19-1, p. 21, tpp. 79–80; Doc. 19-1, pp. 25–26, tpp. 94–100). She also does not dispute that Mr. Johnson emailed her several times asking for updates on the timeline for the Sungard contract or that the tool crib project was assigned in 2013 and still not completed with final signatures when she was terminated in 2015. (Doc. 19-1, pp. 18, tpp. 65; Doc. 19-1, pp. 45, tpp. 175; Doc. 19-1, pp. 48, tpp. 188).

Ms. Monse's annual reviews indicate that some of Mr. Martin's criticisms of her were consistent with areas that reviewers, over the years, had identified for improvement. For example, in Ms. Monse's evaluation for the 2010 calendar year, her reviewers stated that she needed to set timelines to ensure her projects were completed "in a reasonable time frame." (Doc. 19-6, p. 62). Thus, her January 2015 evaluation was not the first time Ms. Monse was told to complete tasks more quickly. Ms. Monse's evaluations for calendar years 2009, 2010, and 2011 indicate that Ms. Monse should work on conflict resolution, so January 2015 was not the

first time Ms. Stephenson suggested that Ms. Monse should improve her conflict resolution skills. (Doc. 19-6, pp. 60, 63, 66). *See White v. Dixie*, No. 17-11123, __ Fed. Appx __, 2018 WL 3343224, *8 (11th Cir. July 9, 2018) (affirming summary judgment in race discrimination action where evidence of supervisor's discriminatory animus was not enough to establish that the employer's stated reasons for an employment decision were pretextual where employee's supervisors' critiques of him were consistent; previous supervisors had "observed performance deficiencies of the same type" as those cited as reasons for termination).

It is undisputed that Mr. Martin raised expectations for the entire team when he took over as Director of Global Procurement. (Doc. 19-6, pp. 3–4, tpp. 8–9; Doc. 19-7, ¶ 3). "Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important." *Rojas*, 285 F.3d at 1343. Ms. Monse has not submitted evidence that Mr. Martin imposed higher expectations on her than on other employees. *See Rojas*, 285 F.3d at 1343. In fact, Ms. Monse complained that after Mr. Martin became Director of Global Procurement, Ms. Stephenson became more demanding, but that seems to be because Mr. Martin demanded more of Ms. Stephenson. The comments in Mr. Martin's annual employee ranking for

2014 indicate that he set the bar high for all employees under his supervision. (Doc. 31-1, p. 4).

Ms. Monse argues that ADTRAN's timeline does not make sense and thus is evidence of pretext. (Doc. 22, pp. 27–29). Specifically, she argues that, although Ms. Stephenson testified that she completed Ms. Monse's review for calendar year 2014 and the attached PIP while Ms. Monse was on FMLA leave, Ms. Stephenson did not review these documents with Ms. Monse until March 19, 2015, nearly five weeks after Ms. Monse returned from FMLA leave. (Doc. 22, p. 27). Ms. Monse argues that it was not reasonable for ADTRAN to determine in November 2014 that a PIP was needed but then choose not to discuss that PIP with Ms. Monse until March 2015. (Doc. 22, pp. 28–29). Ms. Stephenson and Mr. Martin have not explained the five-week delay except to say that Ms. Stephenson had to wait for Human Resources to review and approve the PIP. (Doc. 19-6, p. 11, tp. 39).[5]

There are a number of problematic timing issues concerning Ms. Monse's evaluation for calendar year 2014. Mr. Martin testified that "[t]he decision was made to put [Ms. Monse] on a performance improvement plan when [ADTRAN] completed [its] evaluation of [its] employees based on their performance in calendar year [2014], which was completed in November of 2014." (Doc. 19-5, p.

---

[5] Ms. Stephenson cannot recall when she submitted the PIP to the Human Resources Department. She does not know whether she submitted the PIP before or after Ms. Monse returned from FMLA leave. (Doc. 19-6, p. 11, tpp. 39-40 ).

19, tp. 59).  Mr. Martin began his employee rankings for calendar year 2014 on November 24, 2014 and last modified the rankings document on December 2, 2014 (Doc. 19-7, p. 31).  In the rankings document, the comments for Mr. Paul, the employee who fell below Ms. Monse on the list, mention a "potential PIP" for Mr. Paul.  (Doc. 31-1, p. 4).  There is no such indication in the comments regarding Ms. Monse, despite the fact that Mr. Martin testified that he already had made the decision to put Ms. Monse on a PIP.

The PIP begins with the following "performance deficiency":

Beginning in early 2014 Lynne has not been contributing to the team at an acceptable level.  In spite of discussions with Lynne that performance expectations for Procurement have been raised to a higher level, she continues to perform her job tasks at a pace that is unacceptable to both management and her customers.

(Doc. 19-4, p. 39).  The first example that Ms. Stephenson provided of this deficiency states:  "Lynne was to send out a Request for Quotation for the toolcrib by the end of March 2014.  It was not sent out until June and has yet to be completed."  (Doc. 19-4, p. 39); *see also* (Doc. 19-6, p. 75) (Monse Review Calendar Year 2014 -- "Lynne had a[n] RFQ for the toolcrib that was to be sent out by the end of March.  It was sent out June of 2014 and as of the date of this review has not be [sic] completed.").  Neither Ms. Monse's review for calendar year 2014 nor the PIP acknowledges that Ms. Monse took four weeks of FMLA leave

beginning on April 17, 2014.  Although the leave does not account for all of the delay, it explains part of the delay.

Ms. Monse testified that when she returned from FMLA leave in May 2014, Ms. Stephenson's demeanor had changed; Ms. Stephenson did not want the employees in her department "to be sick.  She didn't like us to be out."  (Doc. 19-1, p. 9, tr. p. 31).  When asked in her deposition if FMLA leave may have caused Ms. Monse to "fall behind on some of her projects," Ms. Stephenson replied:  "If she is out on leave, she is not able to work from home."  (Doc. 19-6, p. 14, tr. p. 52).  When asked what consideration Ms. Monse received for deadlines while she was on FMLA leave, Ms. Stephenson stated:  "There is some consideration."  (Doc. 19-6, p. 14, tr. p. 52).  Ms. Monse explained that when she returned from leave, she would work overtime and work "furiously to catch up on any tasks that were left over or unattended."  (Doc. 19-6, p. 79).

With respect to the toolcrib project, the PIP states:  "The proposals received for the toolcrib are to be reviewed, finalized and the contract awarded by March 31, 2015."  (Doc. 19-4, p. 40).  But Ms. Stephenson did not give Ms. Monse the PIP until March 19, 2015.  (Doc. 19-6, p. 27, tp. 102).  Reasonable jurors could conclude that Mr. Martin and Ms. Stephenson were setting Ms. Monse up to fail.  Ms. Monse requested an extension for the toolcrib project until April 15, 2015, so

that she could "complete FOQ contracts due on March 31, 2015." (Doc. 19-6, p. 78).

There is other evidence that Ms. Stephenson and Mr. Martin set Ms. Monse up to fail. This evidence concerns Ms. Monse's "unacceptable" pace in performing her "job tasks." (Doc. 19-4, p. 39). In December 2014, when a doctor instructed Ms. Monse to stay home for three days because of sciatica, Ms. Monse went to the office and worked a full day and then worked from home the second day for nine hours. (Doc. 9-4, p. 18). Ms. Monse advised Ms. Stephenson that a doctor had instructed her to stay home for three days. Ms. Monse asked Ms. Stephenson to allow her to work from home because she had deadlines to meet. (Doc. 19-6, p. 18, tr. pp. 66-68). The deadlines were month-end and quarter-end deadlines. (Doc. 19-1, p. 23, tr. p. 86). Ms. Stephenson testified that Ms. Monse could have worked as many hours as she would like to meet her deadlines when she returned from leave, but Ms. Stephenson told Ms. Monse that if she was going to be out of work for a period of time because of her health, she had to take FMLA leave, and she could not work from home. (Doc. 19-1, p. 23, tr. p. 86; Doc. 19-6, p. 19, tr. pp. 69-70). Mr. Martin would not allow Ms. Monse to work from home in December 2014, a date subsequent to November 2014 when Mr. Martin says he made the decision to place Ms. Monse on a PIP, in part because he was not satisfied with the pace of Ms. Monse's work. (Doc. 19-7, p. 3, ¶. 3.b).

Ms. Stephenson testified that Ms. Monse could not work from home "[b]ecause the role as procurement specialist cannot be done effectively and efficiently working from home for an extended period." (Doc. 19-6, p. 18, tr. p. 66). The record suggests otherwise. For example, before Ms. Stephenson instructed Ms. Monse to stop working from home, Ms. Monse obtained approval from the vice-presidents of four different departments on a critical purchase order. (Doc. 19-1, pp. 20-21, tr. pp. 76-78). Again, the record indicates that Ms. Monse worked a 9-hour day from home.

Ms. Monse's review for calendar year 2014 does not mention the fact that 2014 was her first full year as a procurement specialist, and her job duties changed in her new role. Reasonable jurors could conclude that Mr. Martin and Ms. Stephenson unfairly criticized Ms. Monse for the pace of her work when she was trying to learn new skills.

But in 2015, this much had not changed – in consecutive years, Ms. Stephenson had ranked Ms. Monse at the bottom of all of the employees in Ms. Monse's workgroup, whether the group consisted of buyers (2009-2013) or procurement specialists (2014). This was true in years when Ms. Monse did not use FMLA leave, and it was true in years when she used FMLA leave. It was true in the many years that Ms. Monse received high marks and positive reviews, and it was true when she received a critical review for the 2014 calendar year. It was true

in years when Ms. Monse was complimented for her "positive attitude" (calendar years 2010 and 2011) and in calendar year 2014 when she was criticized for being "argumentative." When the time came for a reduction in force, Mr. Martin eliminated the positions of the lowest ranked employees in three sections of the Global Procurement Department. Ms. Monse had held her low ranking for years, and Mr. Martin expressed doubt that Ms. Monse "ha[d] the potential to be even middle level performance over the long term." (Doc. 31-2, p. 2, tp. 16). Thus, although the evidence demonstrates that ADTRAN handled Ms. Monse's periods of FMLA leave in 2014 and early 2015 poorly, per the *White* decision, the evidence does not indicate that Ms. Monse's weeks of FMLA leave in 2014 and early 2015 *caused* Mr. Martin to include her among the ADTRAN employees who lost their jobs in the 2015 RIF. Because Ms. Monse has not presented sufficient circumstantial evidence to demonstrate that ADTRAN's stated reason for her termination is unworthy of credence, the Court must grant ADTRAN's motion for summary judgment.

## CONCLUSION

For the reasons stated, the Court GRANTS ADTRAN's motion for summary judgment. (Doc. 18). The Court will enter a separate final judgment.

**DONE** and **ORDERED** this **September 28, 2018**.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE